UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| PATRICK J. HIGGINS,<br><br>   Petitioner,<br><br> v.<br><br>W.J. SULLIVAN,<br><br>   Respondent.        / | No. C 11-4323 YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

**INTRODUCTION**

  Petitioner seeks federal habeas relief from his state convictions. For the reasons set forth below, the petition for such relief is DENIED.

**BACKGROUND**

  In 2008, an Alameda County Superior Court jury found Petitioner guilty of murder, consequent to which he was sentenced to 25 years-to-life in state prison. Evidence presented at trial shows that in 2006 Petitioner and his friend Alfred Roberts robbed and killed Joseph Briggs:

> Briggs came up [to Petitioner and Roberts] and asked if anyone had heroin. Someone told Briggs to go around the corner. He did. [¶] After Briggs left, Roberts said to [Petitioner], "We gonna get him." "He may have some money on him." Roberts told [Petitioner] to stop Briggs. [Petitioner] agreed. He stopped Briggs and started talking to him. As he did, Roberts hit Briggs in the jaw. Briggs spun, hit a wall, and fell to the ground as if he was asleep. Roberts then went through [Briggs's] pockets and took his wallet. [Petitioner] also went through [Briggs's] pockets but he could not find anything.

(Ans., Ex. G at 2.) Petitioner, who did not testify at trial, admitted to police that he and Roberts had attacked and robbed Briggs, but that neither he nor Roberts were responsible for Briggs's death. (*Id.* at 3–4.)

Petitioner was denied relief on state judicial review. This federal habeas petition followed. As grounds for federal habeas relief, Petitioner claims: (1) insufficient evidence existed to support his conviction for first degree murder, in violation of due process; (2) admission at trial of Petitioner's involuntary out-of-court statement violated his right to due process; (3) the prosecutor's peremptory challenges of two prospective jurors was race-based and violated the Equal Protection Clause; (4) the imposed sentence was excessive, in violation of the Eighth Amendment; and (5) defense counsel rendered ineffective assistance.

**STANDARD OF REVIEW**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The state court decision to which Section

2254(d) applies is the "last reasoned decision" of the state court, *see Baker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005), which in the instant matter is the state appellate court decision on direct review (Ans., Ex. G).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

## DISCUSSION

### I.   Sufficiency of Evidence

Petitioner claims insufficient evidence existed to support his conviction for first degree felony murder because the prosecutor presented no evidence that either Roberts or he dealt the fatal blow. According to Petitioner, when they left the scene, Briggs was lying on the street "snoring," not dead, and that others who later happened upon the body delivered the mortal blow.

The state appellate court found sufficient evidence to support Petitioner's conviction for first degree murder and rejected this claim:

> [Petitioner] admitted to the police that he and Roberts intended to rob Briggs. [Petitioner] also admitted that during the robbery, Roberts hit [Petitioner] in the jaw causing him to fall to the ground. The doctor who performed the autopsy

> on [Briggs's] body testified that Briggs died as the result of a hemorrhage to an artery on the back of his neck. The doctor said the injury could be have been caused by a punch to the head. The jurors considering this evidence reasonably could conclude that Briggs was killed by the blow to the jaw that Roberts inflicted.

(Ans., Ex. G at 3–4.) The state appellate court also found unpersuasive Petitioner's assertion that the evidence "strongly suggests" other persons delivered the fatal blow:

> We reject this argument for two reasons. First, the evidence [Petitioner] cites does not definitively prove that a second post-robbery beating in fact occurred. For example, [Petitioner] cites evidence from a witness, Steve Lewis, who told police on the night of the crime that he saw as many as eight people kicking a person who was on the ground. However, Lewis recanted his statement at trial and he denied telling the police that he saw anyone being beaten. [Petitioner] cites his statement to the police that Briggs began "snoring" after being punched by Roberts. He argues that if Roberts's blow was fatal, Briggs would have not been snoring. Although, the doctor who performed the autopsy said the type of injury Briggs suffered would not cause immediate death. Some persons will die within three to five minutes. Others will live an even longer period of time. Thus, even if we were to assume that Briggs was snoring after being hit, that did not rule out the possibility that Briggs was killed by the blow Roberts threw. [Petitioner] cites evidence from the autopsy that indicated Briggs suffered many injuries including some to his head and face. However, the doctor who performed the autopsy said he had no way of knowing precisely when those injuries were inflicted and that they could have occurred as many as three days before Briggs's death. In sum, the evidence that a second beating occurred was, at most, equivocal.
>
> Second and more importantly, even if we were to assume that a second post-robbery beating did occur, that would not undermine the judgment. As we have said, the issue on appeal is whether the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt, and that standard has been met here. The fact that the record also contains other evidence that might have supported a different conclusion is irrelevant.

(*Id.* at 4–5.)

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Nor does a federal habeas court in general question a jury's credibility determinations, which deserve near-total deference. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). Indeed, if a record supports conflicting inferences, a federal habeas court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

resolution." *Id.* The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See Jackson*, 443 U.S. at 324. "[T]he only question under *Jackson* is whether that [jury] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, No. 11-1053, slip op. 7 (U.S. May 29, 2012).

Petitioner's claim fails. A rational trier of fact could have found from Petitioner's own confession and the doctor's testimony that Roberts dealt the fatal blow when he knocked Briggs unconscious. Because such a conclusion does not fall below the threshold of bare rationality, Petitioner is not entitled to habeas relief on this claim. Furthermore, his contention that evidence showed that others may have dealt the mortal blow is unavailing. First, the evidence of a second beating was, as the state appellate court concluded, at best subject to multiple interpretations. Second, even if this evidence was strong and unambiguous, the record shows that the jury did not credit such evidence, and that it had sufficient grounds to do so. Third, this Court must assume that the jury resolved any conflicts in the evidence in favor of the prosecution, and defer to that resolution. Accordingly, Petitioner's claim is DENIED.

## II. Admission of Confession

Petitioner claims that the trial court's denial of his motion to exclude his involuntary confession to police violated his Fifth Amendment right against self-incrimination. Petitioner bases his argument on four portions (A, B, C & D) of the interrogation, and on (E) his age and other personal characteristics. The state appellate court rejected these claims, finding that the officers "did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency," nor was the confession otherwise involuntary. (Ans., Ex. G at 7.)

The Fourteenth Amendment prohibits the admission of involuntary confessions in state criminal cases. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). A court on direct review is required to determine, in light of the totality of the circumstances, "whether a confession [was] made freely, voluntarily and without compulsion or inducement of any sort." *Withrow v. Williams*, 507 U.S. 680, 689 (1993) (internal quotation marks and citation omitted). A federal habeas court must review de novo the state court's finding that a confession was voluntarily given. *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990). But a state court's subsidiary factual conclusions are entitled to the presumption of correctness. *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (deferring to state appellate court's conclusion that challenged statement did not constitute threat or promise).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The interrogation techniques of the officer must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433–34 (1986). Generally encouraging a Petitioner to tell the truth does not amount to police coercion. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997). Police deception alone "does not render [a] confession involuntary," *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993), nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer, *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003). The pivotal question in cases involving psychological coercion, "is whether [, in light of the totality of the circumstances,] the defendant's will was overborne when the defendant confessed." *Miller*, 984 F.2d at 1031.

### A.   First Passage

The state appellate court summarized the facts and its holding as follows:

> First, [Petitioner] relies on a passage during the first session that occurred just after he admitted he patted Briggs down as he was lying on the ground. [Petitioner] told the sergeants he did not take anything from Briggs and he was

> reluctant to say whether Roberts took anything either. The sergeants questioned him on those points as follows:
>
> '[Sergeant Cruz]: No, it don't sound right at all, you know? You're lookin in the man's pockets. We know he's got money. His partner says they got there with the money, okay, to buy heroin. You know, they admit that . . . he admits that. He admits what that money was there for, okay? He admits that money was there to buy heroin. Who got the money, okay? Like my partner's sayin' . . . we have come this far, okay? To stop now, you know . . . it's like you're hidin' somethin' that's huge. It's like you're hidin' somethin' that's huge. And folks are gonna wonder, well, how can . . . how can we believe him about this other stuff, when he's hidin' somethin' so big? When he's hidin' a pink elephant in the room? Everybody sees it. Everybody sees it, okay? Everybody sees it.
>
> '[Sergeant Morris]: And *we ain't even trippin' over it.*
>
> '[Sergeant Cruz]: No.
>
> '[Sergeant Morris]: We're just (inaudible)
>
> '[Sergeant Cruz]: — *It's not what killed him.*
>
> '[Sergeant Morris]: No, exactly.
>
> '[Sergeant Cruz]: It's not what killed him, okay? But it goes to your credibility, okay? It goes to you[r] credibility.' (Italics added.)
>
> Relying on the portions of the passage above that we have italicized, [Petitioner] argues that the 'implication' from the 'trippin' comment was that he 'should feel free to admit his involvement in the robbery, since even the police themselves were unconcerned about it.' [Petitioner] argues the 'It's not what killed him' comment 'implied that [he] would not be charged with murder, since his conduct was not what killed Briggs.'

(Ans., Ex. G at 7–8.) The state appellate court rejected Petitioner's interpretation:

> It is not entirely clear what the "trippin" comment meant in context, but it cannot reasonably be interpreted as appellant suggests. Sergeant Cruz repeatedly described the robbery and appellant's possible involvement in it as "huge" and "big" and the "pink elephant in the room." Read in context, those comments would have to convey to appellant that the sergeants were keenly interested in the robbery and appellant's possible involvement in it. They could not reasonably have been interpreted to mean that the sergeants were unconcerned about the robbery.
>
> As for the "[i]t's not what killed him" comment, it falls far short of expressing a promise of lenient treatment in exchange for cooperation. The sergeants did not represent that they, the prosecutor, or the court would grant appellant any particular benefit if he told them the details of the robbery. To the extent the comment implied that it would work to appellant's advantage if he told the truth, they did nothing more than explain to him the benefits that might "'flow [ ] naturally from a truthful and honest course of conduct.'" [Citation omitted.]

(*Id.* at 8.)

Petitioner's claim is without merit. It simply not plausible that the officers' comments constituted promises of leniency or improper interrogation tactics, nor is there any other evidence that the confession was involuntary. The state appellate court reasonably determined that the officers were permissibly encouraging Petitioner to tell the truth ("it goes to your credibility") about a robbery they certainly found significant. As for "trippin,'" it is at worst subject to multiple interpretations. Read on its own, it could have meant "we are unconcerned about the robbery." Read in context, however, the more plausible meaning was that "we are unconcerned about the robbery because we have so much evidence to prove it that you might as well tell the truth about it." Whatever its exact meaning, Petitioner has not shown, or even shown a reasonable possibility, that under the totality of the circumstances that improper tactics were used, or that his will was overborne. Petitioner's claim is DENIED.

### B.     Second Passage

The second passage reads:

Q. [Sergeant Cruz]  All right. I wanna go back to where this guy falls against the wall and then collapses down, okay? There's another thing that we gotta talk about here, dude, okay? Remember we talked about neighbors, and we talked about people on the street, okay? You know . . . I do believe . . . that even [Roberts], when he hits [the] dude . . . how many times does he hit him?

"A. Once.

"Q. One time?

"A. One time. Once.

"Q. I do believe . . . that when he hits him, it's just to rob him. It ain't to kill him. I do . . . I do *firmly believe* that, okay? It's just to rob him. It's not to kill him, okay? But . . . these are the things we gotta answer right now [ ]. Things that I gotta explain to the D.A. And here's the things I gotta explain about: People are saying — people in that 'hood there are seeing — and other people who are standin' near the smoke shop-are also seeing you, and others — doin' some things." (Italics added.)

(Ans., Ex. G at 8–9.) On appeal and here, Petitioner asserts that "firmly believe" looks "suspiciously like an assurance that this was only a robbery investigation and not a homicide

case." (*Id.* at 9.)

The state appellate court rejected this claim for reasons this Court finds reasonable:

> We simply disagree with [petitiner's] interpretation of the record. Read in context, the thrust of the comment is clear. Sergeant Cruz was acknowledging that when Roberts hit Briggs, he probably did not intend to kill him. He only intended to rob him. That straightforward comment cannot reasonably be interpreted as an effort to "downplay" [Briggs's] murder, nor can it be interpreted as an assurance that this was only a robbery investigation and not a homicide case.

(*Id.*)

Petitioner's claim entirely lacks merit. The state court's interpretation was reasonable and warrants deference. His claim would fail even if his interpretation was correct. Such slight (alleged) downplaying does not support a finding of promised leniency or that his will was overborne. Furthermore, even if the police were being deceptive, such deception is not impermissible. See *Miller*, 984 F.2d at 1031. This claim is DENIED.

### C. Third Passage

The state appellate court summarized the relevant facts and its rejection of Petitioner's claim as follows:

> [Petitioner]'s next argument is based on comments Sergeant Morris made during the first session when he was trying to determine whether [Petitioner] and Roberts had discussed robbing Briggs before the actual crime.
>
> "Q. [Sergeant Morris]: What my partner's tryin' to tell you in so many words is that this thing is too well-orchestrated for it to be haphazard. In other words, the way this whole thing is goin' down, we believe it happened the way it happened. And that was, this guy walks up . . . he's not from the neighborhood, obviously . . . guy walks up, 'Go around the corner.' Well, who said it? If you didn't say, then [Roberts] said it. If [Roberts] didn't say it, somebody said it. And it seems like you're still hidin' little tidbits from us. So in other words, if I'm standin' on the cor — well, just hear me out before you start shakin' your head . . . 'cause I used to be a robbery investigator, and so was my partner.
>
> "[Sergeant Cruz]: Yeah.
>
> "[Sergeant Morris]: We're standin' out there . . . dude walks up . . . 'Go around the corner.' Well, if it wasn't — and we know that's not the heroin spot right there. The heroin spot is a little further down. And that guy — they sell crack there, obviously . . . they sell weed there. They don't sell (inaudible) right there. So when he went around the corner, was the . . . the intent was, 'Okay, let's go around and rob this guy.' *That's the whole ... the whole issue*

> *here is about a robbery — it's not about a homicide . . . it's not about a murder.* The guy goes around the corner . . . it sounds like somethin' was said . . . like [Roberts] could a said something to you, hey, whatever. Whatever that conversation was, we need to know about it." (Italics added.)
>
> [Petitioner] suggests the comment we have italicized would have conveyed the message to [Petitioner] that because this was a robbery investigation, he did not need to worry about being charged with murder. Again, we think [Petitioner] has misread the record. Sergeant Cruz did not state nor did he imply that [Petitioner] did not have to worry about being charged with murder. He simply acknowledged the likely fact that when the plan to rob Briggs was hatched, the intent was simply to rob. The comment [Petitioner] challenges could not reasonably have been interpreted as he suggests.

(Ans., Ex. G at 9–10.)

Petitioner's claim fails for the same reasons noted above. First, the state court reasonably interpreted the interaction. This Court must therefore defer to this interpretation. Second, Petitioner's claim would fail even if his interpretation was correct. The interaction does not support a finding that his will was overborne or that the officers either promised leniency, or used impermissible tactics. This claim is DENIED.

### D. Fourth Passage

The state appellate court's factual summary and rejection of the claim are as follows:

> "[Sergeant Morris]: . . . Just tell us what happened. We need to know the truth. That's what he's tryin' to get you to say, man. We like pullin' teeth now. We got the elephant out there. We tryin' to get the little-the little piece-the gnats now — the little pieces of it.
>
> "[Sergeant Cruz]: *As scared as you are of the truth, man . . . as scared as you are of the truth . . . it's the truth, okay, that's gonna help us make a decision about you.*
>
> "[Sergeant Morris]: *Exactly. A major decision.*" (Italics added.)
>
> [Petitioner] contends the portion of the passage we have italicized "suggested" that "if [Petitioner] told [the sergeants] what they wanted to hear, he would be permitted to go home and would not be charged at all." We are not persuaded. The sergeants told [Petitioner] that the "truth" would help them make a decision about him. They did not say or suggest that if [Petitioner] told the truth, [he] would be permitted to go home or that he would not be charged. [Petitioner] has read far more into the comments in question than is reasonable.

(Ans., Ex. G at 10–11.)

Petitioner's claim fails. The officers merely encouraged Petitioner to tell the truth. They did not promise, threaten or coerce. This claim is DENIED.

### E. Personal Characteristics

Petitioner contends that his youth, lack of education, and the conditions of the interrogation show that under the totality of the circumstances his confession was involuntary:

> He contends his statement must be deemed involuntary because at the time of his arrest he was "just" 20 years old, his stature was slight, he was "still living with his parents," he had dropped out of high school in the 10th grade, and that he had "little experience" with the criminal justice system. [Petitioner] also complains that during his "eight hours in police custody" he was kept in two small rooms, "interviewed three separate times, handcuffed to a table for at least part of the time, never offered either food or water, and given just one short break to go to the bathroom and smoke a cigarette." Finally, [Petitioner] complains that Sergeant Cruz denied his request to make a phone call.

(Ans., Ex. G at 11.) The state appellate court rejected this claim because (1) it is not unusual for persons of Petitioner's age to live with their parents, (2) his assertion of a lack of criminal experience is uncut by the fact of his two prior arrests, (3) the length of the two interrogations was a little over three hours, with an hour and 45 minute break in between them, (4) the circumstances of the interrogation (denial of a phone call) were not "pivotal" considering that he was being questioned about a serious crime, and (5) police granted him a smoke and a bathroom break when he asked for them. (*Id.* at 11–12.)

Petitioner's claim is without merit. The totality of the circumstances does not indicate that his confession was involuntary. Petitioner was an adult, not a juvenile, had had prior experience with law enforcement, was actually interrogated (as opposed to detained at the police station) for about three hours, and never asked for the privileges he says police never offered. Police allowed him to smoke upon request. Furthermore, being handcuffed, in small rooms for hours, and denied privileges during a criminal interrogation, without more, does not offend reasonable sensabilities, suggest coercion, or show that police took advantage of Petitioner. The record confirms that Petitioner understood his rights and

United States District Court
For the Northern District of California

voluntarily waived them by talking to police.[1] As there has been no showing that his confession was involuntary, Petitioner's claim is DENIED.

**III.     Peremptory Challenges**

Petitioner claims that the trial court violated his equal protection rights by denying his motion objecting to the prosecutor's use of his peremptory challenges to exclude three African-Americans from the jury, of which only two, V.M. and J.H.P., concern this Court. The relevant facts are as follows:

> The prosecutor used three of his peremptory challenges to remove African American jurors. Immediately after the third challenge, defense counsel advised the court that he needed to discuss an issue privately. The court made note of counsel's request, but continued with jury selection. Twelve jurors and three alternates were selected.
>
> After jury selection was completed, the court addressed defense counsel's motion. Defense counsel noted that African Americans are a protected class and that the prosecutor had used his challenges to remove three of them. Counsel acknowledged that an African American was on the panel that had been sworn, but he argued that did not "excuse what happened previously . . ."
>
> The trial court found defense counsel had made a prima facie case. It asked the prosecutor to explain his challenges.
>
> The prosecutor denied using his challenges to remove jurors based on their race. He noted that there was an African American woman on the jury when he passed initially, who the defense had then removed. He also noted there was an African American on the panel that had been sworn. The prosecutor then went on to explain his reasons for excusing the jurors in question. Only two of those explanations are relevant here. The prosecutor stated as follows:
>
> "Regarding Juror No. 20, [J. H.P.], she was currently a psychology or studying psychology at College of Alameda. She answered in her questionnaire that she would disregard the testimony of a drug user. I anticipate that one of the witnesses I'll be calling in this case will be an admitted drug user.
>
> "She also expressed great displeasure with the police, saying she doesn't believe they have citizens best interests at heart. She said most of her friends have had very negative experiences with police officers. She said that her ex-boyfriend had a very bad experience with a police officer. And while she

---

[1] Petitioner asserts that at the interrogation he was "still feeling intoxicated" from his ingestion of marijuana, alcohol, and Ecstasy. (Pet., P. & A. at 29.) According to him, this intoxication made him unable to understand the *Miranda*-waiver form he initialed. (*Id.*) A review of the record shows that petitioner had sufficient understand of his rights and of the circumstances in which he was present. There is no showing that he was so intoxicated that it interfered with his decision to waive his rights.

said that she felt she could put that aside, I didn't believe that the body language that she was exhibiting in court expressed those views. She had her arms crossed and was not looking directly at me during some of her questioning. She appeared angry to be here and [it] did not appear that she wished to be a juror in this case.

"She also answered in her questionnaire that she felt that African-Americans and minorities are treated differently by the criminal justice system and they're not treated fairly, which leads me cause to believe she may at some point feel some sympathy towards the defendant given this position.

"I believe that's regarding No. 20.

". . . [R]egarding Miss [V. M.], Juror No. 11, on her questionnaire, when asked do you have any religious beliefs, moral feelings, or philosophical principles that may interfere with your ability to sit in judgment of another person, she checked the box yes and explained that she felt she can't be that sure that a person is innocent or guilty.

"I felt based on her answers, both here an in court, that she would have difficulty in making a decision. And I asked for her to be excused for the same reasons that I had asked prior jurors to be excused based on their similar answer that they did not feel that they could sit or be comfortable sitting in judgment of another person.

"In addition, Miss [M.] disclosed that her son-in-law had been arrested for selling marijuana in Oregon. She answered that she did not think that he was treated fairly by the criminal justice system and she felt that the punishment did not fit the crime. Based on that I did not feel that she would be able to fully put aside the issue of penalty or punishment in this case because of her son-in-law's case.

"Finally, she answered question No. 38 regarding her attitude in general towards law enforcement officers: Sometimes they use too much force and too much-they use too much force, and my impression was that they shoot in some cases where it didn't seem necessary.

"In addition she said that if a person had made a false statement on a previous occasion, she would automatically disregard anything else they had to say. She said that they cannot be trusted to tell the truth if they're doing so under oath.

"As the Court's aware there is going to be a witness that testified under oath at a preliminary hearing that gave testimony that was very different from what he had initially said to the police, and I didn't think that she would be able to fairly judge his testimony.

"Finally, she indicated that it was her belief that African-Americans and other minorities are treated differently by the criminal justice system and that in many cases that's because they don't have the resources to get the best lawyer. And that led me to believe she may at some point develop some sympathy towards [Petitioner] and not be able to put that aside."

> The trial court accepted the prosecutors explanations and denied the motion explaining its decision as follows: "All right. Then the Court is satisfied that [the prosecutor] has given nonrace-based reasoning that was very sound for the exclusion of these three potential jurors. So the motion, *Wheeler-Batson* motion was denied."

(Ans., Ex. G at 13–15.) The state appellate court found substantial evidence to support the trial court's denial of Petitioner's motion, and rejected the claim. (*Id.* at 17–20.)

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

In evaluating an explanation of racial neutrality, proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez*, 500 U.S. at 355–62. Such a finding turns largely on the trial court's evaluation of the prosecutor's credibility, *Rice v. Collins*, 546 U.S. 333, 340–42 (2006). To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the

assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995). What matters is the "*genuineness* of the motive" behind the racially-neutral explanation, not "the *reasonableness* of the asserted nonracial motive." *Id.* "To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Gaston v. Curry*, 406 Fed.App'x. 144, 145 (9th Cir. 2010) (quoting *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006)).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a Petitioner rebuts the presumption by clear and convincing evidence. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[W]e must defer to the [California Court of Appeal's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Gaston*, 406 Fed. App'x at 144 (quoting *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010)). A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not rebutted the presumption that the state court's conclusion was a reasonable one. *See Miller-El*, 545 U.S. at 240. The Court need not dwell on the first step of the *Batson*

analysis, whether Petitioner made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking the jurors, and (b) the trial court ruled on the ultimate question of intentional discrimination.

With respect to the second *Batson* step, the record does not support Petitioner's assertion that the prosecutor's decision was based on constitutionally offensive considerations. As the state appellate court found, the record supported the prosecutor's stated nondiscriminatory reasons for the peremptory challenges. As for V.M., she indicated that (1) her religious beliefs might interfere with her ability to sit in judgment on another person, a reason both the prosecutor and defense had used to excuse other possible jurors; (2) she believed her brother-in-law was not treated fairly by the justice system; (3) she had negative views about the police, who, she believed, often used excessive force; (4) she would not believe a witness credible if he had lied on a prior occasion; and (5) she believed African-Americans were not treated fairly in the justice system. Such statements gave the prosecutor reason to believe that she would not be an "impartial, indifferent" juror. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted).

As for J.H.P., (1) she indicated that she would disregard the testimony of a drug dealer; (2) she believed the criminal justice system treated African-Americans differently, (3) she had negative views about the police; and, (4) according to the prosecutor, her "body language" and demeanor showed that that she was "angry" to be at court. Such statements, which were similar to those given by V.M., gave the prosecutor reason to believe that J.H.P. would not be an impartial juror.

As to the third *Batson* step which queries whether there was intentional discrimination, Petitioner has not shown clear and convincing evidence to rebut the presumption that the trial court's determination was correct, or shown why this Court should favor Petitioner's interpretation of the record over the trial court's credibility determination.

A comparative juror analysis, which was conducted by the state appellate court in its review of Petitioner's claims and which Petitioner urges this Court to engage in, further

supports this conclusion. The relevant facts are:

> Next, [Petitioner] notes that many of the characteristics cited by the prosecutor [ ] when explaining his challenge of V.M. were shared by other jurors who actually served. For example, jurors 1, 6, and 7 also indicated they had reservations about sitting in judgment of others. Juror 8 also had a relative who had a negative experience with the criminal justice system. Jurors 1, 2, 4, 7, and 10 also indicated they would disregard the statement of a witness who had testified falsely on a prior occasion. Juror 9 also said he held negative views of the police. Jurors 7 and 9 and alternate jurors 1 and 2 also said minorities were treated differently by the criminal justice system. According to [Petitioner], this "comparative juror analysis" plainly demonstrates that the prosecutor's challenge of V.M. was pretextual.

(Ans., Ex. G at 17–18.) The state appellate court rejected this claim because "none of the seated jurors had the same combination of characteristics as V.M." (*Id.* at 18.) For example:

> [J]uror 1 [ ] stated in her questionnaire that "murder should be punished so the society will be peaceful." The prosecutor may well have believed that juror 1's belief that murder should be punished made her a desirable juror in a murder case even though she had given other responses that could be viewed as negative. Similarly, juror 7 shared three of the characteristics that the prosecutor cited when excusing V.M. However, juror 7, also said he viewed law enforcement officers positively and that he "appreciate[d] them doing that kind of work." Given the pivotal role that law enforcement personnel were to play in this case, the prosecutor may well have concluded that juror 7's positives outweighed his negatives.

(*Id.* at 19.) Petitioner's claim is without merit. The state appellate court's decision was both reasonable and amply supported. In sum, no other juror had the same combination of factors that deterred the prosecutor from accepting V.M. as a juror. Accordingly, Petitioner's claim is DENIED.

**IV.   Sentence**

Petitioner claims that his sentence of 25 years-to-life violated the Eighth Amendment because no weapon was used and he did not hit the victim. Further, Roberts received a sentence only 11 years.[2] The state appellate court determined that Petitioner had

---

[2] Respondent asserts that this disparity in sentences was "solely due to petitioner's own choices." (Ans., Ex. G at 22 n.5.) Accordingly to respondent, petitioner rejected a plea offer that would have resulted in a "much shorter sentence" because he did not want to testify against Roberts. Respondent also points out that the evidence was weaker against Roberts, who, unlike

procedurally defaulted his claim, and that the claim lacked merit. (Ans., Ex. G at 20–23.)

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment. *Solem v. Helm*, 463 U.S. 277, 303 (1983). Yet "[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [are] exceedingly rare." *Id.* at 289–90. Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle — the precise contours of which are unclear." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotations and citations omitted). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

In *Harmelin*, the Supreme Court upheld a life sentence without the possibility of parole for an offender who had no prior felony convictions and whose sole conviction was for possessing 672 grams of cocaine. 501 U.S. at 961, 995. In *Andrade*, the Supreme Court, under the highly deferential AEDPA standard, upheld a sentence of two consecutive 25-year terms for the nonviolent theft of $150 worth of videotapes. 538 U.S. at 77.

Under these precedents, Petitioner has not stated a claim that is remediable under federal habeas review. Petitioner was sentenced to 25 years-to-life for his participation in a robbery that resulted in a killing. If, as in *Harmelin*, a *life* sentence for a *nonviolent* drug possession conviction was found not to violate the Eighth Amendment, then Petitioner's

---

petitioner, did not confess to the crime. Because of this, Roberts received a favorable plea bargain. (*Id.*)

sentence, which contains the possibility for parole, for his participation in a violent homicide crime similarly will not rise to a violation of the Eighth Amendment. Petitioner's claim is DENIED.

### V. Assistance of Counsel

Petitioner claims that defense counsel rendered ineffective assistance by failing to object to the length of his sentence. The state appellate court rejected this claim because Petitioner's sentence did not violate the Eighth Amendment. (Ans., Ex. G at 23 n.5.)

This claim fails. Twenty-five years-to-life is the statutory term for first degree murder. *See* Cal. Penal Code § 190(a). The trial court had no choice but to impose such a sentence after the jury returned its verdict. Any objection by counsel would have been meritless, and, presumably, denied. Because it is both reasonable and not prejudicial for defense counsel to forgo a meritless objection, *see Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005), Petitioner's claim is DENIED.

### CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondents and close the file.

**IT IS SO ORDERED.**

DATED: August 23, 2012

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**